STATE of Minnesota, Respondent,

v.

Charles GIST, Appellant.

No. C1–83–1107.

Supreme Court of Minnesota.

Dec. 14, 1984.

---

665

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Henn. County Atty., Vernon E. Bergstrom, Richard Osborne, J. Michael Richardson, Beverly J. Wolfe, Asst. County Attys., Minneapolis, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury on a charge of attempted aggravated robbery, Minn.Stat. §§ 609.05, 609.-17, and 609.245 (1982). Pursuant to Minn. Stat. § 609.11 (1982), and Minnesota Sentencing Guidelines and Commentary II.E. (1982), the presumptive sentence for the offense defendant committed was 54 months.[1] The trial court departed durationally from the presumptive sentence, sentencing defendant to an executed prison term of 108 months, with the sentence running consecutively to a previously imposed sentence for which parole was revoked.[2] On this appeal from judgment of conviction, defendant seeks: (1) an outright reversal of his conviction because the evidence of his guilt was legally insufficient; (2) a new trial because the trial court (a) erred in admitting a weapon that the state contended defendant used and (b) erred in ruling that the state could use two prior convictions to impeach defendant's credibility if he testified; or (3) a reduction of his sentence duration to 54 months because there were no aggravating circumstances

1. But for section 609.11, the presumptive sentence for the offense by a person with defendant's criminal history score (three) would have been an executed prison term of 24½ months, that is, one-half of the 49 (45–53) months presumptive sentence for the completed offense (a severity level VII offense). Minnesota Sentencing Guidelines and Commentary II.G. (1982).

2. The use of consecutive sentencing was permitted by Minnesota Sentencing Guidelines and Commentary II.F.1 (1982); the court therefore was not required to justify it by pointing to aggravating circumstances.

present. We affirm defendant's conviction but reduce his sentence.

On the evening of January 4, 1983, Frederick Cannedy and a friend, Dana Simms, walked to Cannedy's sister's residence, the lower half of the duplex at 3225 Clinton. While there, Cannedy briefly saw Donnie McKissic who lived in the upstairs half of the duplex with his mother. After Cannedy and Simms left the house and were walking down an alley toward Cannedy's mother's house at 3425 Second Avenue South, they saw two men running ahead of them. Cannedy and Simms recognized one of them as Donnie McKissic. When Cannedy and Simms neared Cannedy's house, the other man approached Cannedy, revealed the barrel of a gun, and told Cannedy to give him his money. Both Cannedy and Simms recognized this man as defendant. Cannedy testified that he knew defendant from when Cannedy was a student at Central High School and that he also had seen defendant once at the McKissic residence. Simms testified that he had met defendant once, although he was not sure when or where they had met. Cannedy did not comply with defendant's demand. Instead, he ran toward the house. Defendant chased Cannedy and tried to remove his wallet while Cannedy pounded on the door and called for help. When Cannedy's 15-year-old sister opened the door, McKissic and defendant fled. The sister saw and recognized McKissic; she did not get a good look at defendant.

Police went to 3225 Clinton and talked with McKissic and his mother. After determining that McKissic's shoes were wet, the officers arrested him. McKissic's mother, at first, refused to permit the police to search her house for defendant and the gun. Police put the house under surveillance and sought to obtain a search warrant. McKissic's mother then changed her mind and consented to the search. Police found defendant hiding in an attic. They also found a sawed-off shotgun wrapped in a towel hidden in the laundry chute. Defendant gave two different false names before admitting his true identity.

1. Defendant contends the evidence of his guilt was legally insufficient and therefore his conviction should be reversed outright. This contention is without merit.

■ 2. (a) Defendant also argues he should be given a new trial because the trial court erred in admitting the sawed-off shotgun since neither Cannedy nor Simms identified it as the gun used by defendant. The issue we must consider is whether the gun tended to connect defendant to the crime or whether it was admitted only to create unfair prejudice to the defendant. *See State v. Webber*, 292 N.W.2d 5, 9 (Minn.1980). Cannedy saw about 4 inches of the barrel sticking out from defendant's coat. Although he could not identify the gun found in the house, that gun was physically consistent with the gun used against him. The fact that someone hid it in the laundry chute also suggests that it was the gun used. Further, the gun clearly was not admitted to create unfair prejudice. Under the circumstances, we conclude that the trial court did not err in admitting it.

■ (b) Defendant also argues that the trial court erred in ruling that the state could use defendant's two prior convictions, 1979 convictions for burglary and simple robbery, to impeach his credibility if he testified. We hold that the trial court did not abuse its discretion in ruling as it did. *See State v. Upton*, 306 N.W.2d 117 (Minn. 1981); *State v. Bettin*, 295 N.W.2d 542 (Minn.1980).

3. Defendant's final contention is that his sentence should be reduced because there were no aggravating circumstances present to justify the double durational departure. The trial court gave defendant the following reasons for departing:

Your record is one of assaultive behavior;

Your immediate prior felony offense involved the assault and serious injury of two vulnerable victims by use of a weapon.

This offense involved a vulnerable victim, a person of marginal intelligence and serious learning disability, which

fact was either known by you or should have been known by you.

Mr. Cannedy testified before this court at some length and it was clear to the Court that Mr. Cannedy was a person of marginal intelligence, and to say he was not injured by being confronted with a sawed-off shotgun flies in the face of common sense, Mr. Gist.

Your conduct in this offense involved the use of a particularly dangerous weapon, a sawed-off shotgun;

You have not been discharged from your prior felony sentence.

You absconded from your parole status as a resident of Freedom House and shortly thereafter committed this present offense.

■■ A defendant's prior record and custodial status at the time of the current offense are considered in determining the defendant's criminal history score. Generally, they cannot be relied upon as factors supporting a durational departure. *See State v. Magnan*, 328 N.W.2d 147, 149–50 (Minn.1983) (rejecting the argument that a qualitative analysis of a defendant's criminal history might justify using it as a ground for departure). The fact that defendant had a prior felony conviction for an offense in which the victim was injured would be a basis for a departure if the current conviction was also for an offense in which the victim was injured. *See* Minnesota Sentencing Guidelines and Commentary II.D.103.2.b.(3) (1982). In this case, however, there was no evidence that Cannedy was injured.

As we stated in *State v. Cox*, 343 N.W.2d 641 (Minn.1984): "The general issue that faces a sentencing court in deciding whether to depart durationally is whether the defendant's conduct was significantly more or less serious than that typically involved in the commission of the crime in question." *Id.* at 643. We believe defendant's conduct was no more serious than that typically involved in an attempted aggravated robbery. The fact that defendant used a weapon did not make his conduct more serious. Weapons typically are involved in

attempted aggravated robberies; in fact, it was the weapon that elevated defendant's conduct from attempted simple robbery to attempted aggravated robbery and subjected defendant to the provisions of section 609.11. The trial court believed Cannedy was a particularly vulnerable victim (as the court put it, "a person of marginal intelligence and serious learning disabilities") and defendant either knew or should have known this. The testimony, however, shows only that Cannedy had dropped out of high school and that he was unemployed and receiving general assistance. In any event, the record does not support concluding that learning disabilities made him particularly vulnerable to the attempted aggravated robbery. The state's theory was that defendant knew Cannedy knew him and that defendant robbed Cannedy thinking that he would not report him to the police. The evidence does not sufficiently support this theory. Indeed, defendant's expression of surprise when he learned police knew his name suggests that he may not have even known that Cannedy knew him. Further, it is questionable whether a person who has a learning disability is any more vulnerable to an armed robbery than a normal person. *See State v. Gardner*, 328 N.W.2d 159, 162 (Minn.1983) (stating there was no substantial basis to believe victim's epilepsy was a substantial factor in the defendant's accomplishing sexual penetration); *State v. Luna*, 320 N.W.2d 87, 89 (Minn.1982) ("regardless of our ages, we are all equally vulnerable in the face of a knife").

We have held that it is more serious to rob or rape people in their home or in the zone of privacy surrounding the home. This was one of the factors justifying the durational departure in *State v. Kindem*, 338 N.W.2d 9 (Minn.1983)·(where the defendant and an accomplice waited for a man to come home with the day's receipts from his business, then robbed and beat him to death in his yard). This factor was not relied upon by the trial court here. It seems to apply because the attempted robbery occurred, at least in part, on the curti-

lage surrounding Cannedy's house. We do not believe, however, that this fact alone justified the double durational departure. The ultimate question still is whether the defendant's conduct was significantly more serious than that typically involved in the offense committed. If anything, in this case, the fact that the crime was committed on the curtilage arguably helped Cannedy prevent completion of the contemplated offense. Under the circumstances, we believe defendant's sentence duration must be reduced to 36 months.[3]

Affirmed as modified.

3. The presumptive sentence duration at the time defendant was sentenced was 54 months. As result of 1983 legislation, good time can now be earned off mandatory minimum sentences. Minn.Stat. § 244.04, subd. 1 (1983). The Sentencing Guidelines Commission responded to this change by reducing what it termed "the inflated presumptive sentences." Summary of Major Sentencing Guidelines Changes, Minnesota Sentencing Guidelines and Commentary (1983). A mandatory minimum of 3 years now yields a presumptive sentence duration of 36 (rather than 54) months or the cell time, whichever is longer. These reductions in presumptive sentence durations are retroactive. Minn.Stat. § 244.09, subd. 11 (1983); Summary of Major Sentencing Guidelines Changes, Minnesota Sentencing Guidelines and Commentary (1983). Because there were no substantial and compelling circumstances justifying a durational departure, defendant's sentence must be reduced to 36 months.